

FILED by _____ _____ D.C.
DKTG

JUL - 9 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-60735-CIV-MARTINEZ/KLEIN

| | |
|---|---|
| TALULAH G, INC., a Nevada Corporation, ) | |
|     Plaintiff, ) | **DEFENDANT THE CORDISH** |
| ) | **COMPANY'S AMENDED MOTION TO** |
| ) | **DISMISS COMPLAINT WITH** |
| vs. ) | **PREJUDICE AND MEMORANDUM OF** |
| ) | **LAW IN SUPPORT** |
| THE CORDISH COMPANY, a Maryland ) | |
| Corporation, and THE SIERRA GROUP, ) | |
| INC. d/b/a SIERRA REALTY ADVISORS, ) | |
| an Illinois Corporation, ) | |
| ) | |
|     Defendants. ) | |
| ) | |
| ) | |

Defendant THE CORDISH COMPANY, a Maryland Corporation ("Cordish"), pursuant

to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, hereby moves to dismiss the

Complaint filed by Plaintiff TALULAH G, INC., a Nevada Corporation ("Talulah") with

prejudice, on grounds set forth in the following Memorandum of Law.

## MEMORANDUM OF LAW

### Plaintiff's Factual Allegations

This is an action seeking relief for promissory estoppel, negligent misrepresentation, and

violation of Florida's Deceptive and Unfair Trade Practices Act, Section 501.201, et seq., Florida

Statutes ("FDUTPA") arising out of an aborted leasing transaction for commercial retail space.

Plaintiff alleges that it was wrongfully induced to "expend significant monies in preparation for

the leasing of retail space" at "The Seminole Hard Rock Hotel and Casino" in Broward County,

Florida ("Hard Rock Hotel"). Complaint, ¶¶3, 5. Although Plaintiff alleges that Defendant

"Cordish developed and marketed the Hard Rock Hotel on behalf of the Seminole Tribe of





Florida," Plaintiff does not allege that either Defendant Cordish or Co-Defendant Sierra Group, Inc. ("Sierra") owned the Hard Rock Hotel. *Id.*, ¶8. Instead, Plaintiff specifically alleges that a non-party to this action -- Seminole Properties Retail, LLC -- "owns and will operate the Hard Rock Hotel." *Id.*, ¶10.

Plaintiff centers its Complaint on the allegations that on either "August 6, 2003" or "August 6/8, 2003," Defendants Cordish and Sierra, represented through their agent, Mr. Marc Offit, that "the parties had an agreement" or that "a lease would be executed" concerning the leasing of Space B6.2 of the Hard Rock Hotel. *Id.*, ¶¶17, 21. Plaintiff alleges that it relied to its detriment on these alleged representations. *Id.*, ¶18. Notwithstanding his allegation of an agreement on a lease for Space B6.2, Plaintiff then alleges that the "parties" negotiated the terms of a lease agreement from "August, 2003 to December, 2003." *Id.*, ¶19. Plaintiff does not attach a copy of the proposed lease or any draft lease agreement. Plaintiff alleges that on "January 9, 2004," Cordish refused to agree to a lease for Space B6.2, and attempted to substitute a "vastly inferior location." *Id.*, ¶19.

### Plaintiff's Legal Theories

Plaintiff has brought a three-count Complaint for promissory estoppel, negligent misrepresentation, and a violation of the FDUTPA against both Defendants, but not the owner of the Hard Rock Hotel. Plaintiff's FDUTPA claim is predicated on an alleged "bait and switch" of Space B6.2 in the Hard Rock Hotel for another Space. Alternatively, Plaintiff's FDUTPA claim is predicated on Defendants' failure to register to do business in Florida in violation of the corporate registration statutes, Sections 607.1501 and 607.1502, Florida Statutes, and allowing their employees to act as brokers without registering as brokers within Florida in violation of Section 475.42, Florida Statutes.

## ARGUMENT

Plaintiff's promissory estoppel claim in Count One fails to state a cause of action because it is an unenforceable "agreement to agree" barred by the Statute of Frauds. The promissory estoppel claim also fails because no definite and substantial promises by Cordish have been alleged. Moreover, Cordish is improperly joined to this action because the Exhibits plainly show that the intended lease was with another party as landlord. Plaintiff's negligent misrepresentation claim in Count Two fails to state a claim upon which relief may be granted because Plaintiff's reliance on an unenforceable "agreement to agree" is unreasonable and non-actionable as a matter of law. The negligent misrepresentation claim also fails because Plaintiff alleges no actionable false statements of existing material fact. Plaintiff's FDUTPA claim fails to state a claim and should be dismissed because Plaintiff, a non-resident Nevada corporation, lacks standing to sue under the FDUTPA. Assuming that Plaintiff's FDUTPA claim can be entertained, the FDUTPA claim fails to state a claim because the FDUTPA cannot be used to circumvent the Statute of Frauds. For these reasons, the Complaint should be dismissed with prejudice because it is incapable of being amended to state a claim.

**I.     Count One For Promissory Estoppel Should Be Dismissed With Prejudice For Failure To State A Claim**

**A.     An "Agreement To Agree" Cannot Form The Basis For A Promissory Estoppel Claim**

Plaintiff's claim in Count One for promissory estoppel fails to state a claim upon which relief may be granted because the Complaint, together with the documents expressly referenced in the Complaint, show that there was never an agreement to lease Space B6.2 to Plaintiff and that no tenancy was intended to arise out of the lease negotiations until a lease agreement was signed by both parties.

Under Florida law, an agreement to agree in the future is not an enforceable promise. *Dows v. Nike, Inc.*, 846 So. 2d 595, 602 (Fla. 4th DCA 2003) ("Where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract").[1]   Where "the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time." *Midtown Realty, Inc. v. Hussain*, 712 So. 2d 1249, 1351 (Fla. 3d DCA 1998) (holding that "letter of intent" for purchase of gas station was unenforceable where it stated that upon execution, the purchaser would present a "more detailed and formal Purchase Agreement"); *Club Eden Roc, Inc. v. Tripmasters, Inc.*, 471 So. 2d 1322, 1324 (Fla. 3d DCA 1985) (memorandum between parties for lease was not enforceable where it was "subject to entering into a more formal Agreement containing mutually satisfactory terms and conditions"), *review denied*, 482 So. 2d 350 (Fla. 1986); *Capital Asset Research Corp. v. Michael Swerdlow Companies, Inc.*, 743 So. 2d 43, 44 (Fla. 4th DCA 1999) (agreement to enter into lease was unambiguous and not enforceable where it was conditioned "upon the parties' execution of a mutually acceptable sublease agreement and that neither party was to have enforcement rights under the letter").

Moreover, a verbal agreement to agree on a future interest in real property cannot form the basis for a promissory estoppel claim. In *Bergman v. DeIulio*, 826 So. 2d 500, 504 (Fla. 4th DCA 2002), the court rejected a promissory estoppel claim based on an unenforceable agreement to agree. There, the plaintiff brought a contract-based claim for a partnership to develop an office building, and alleged reliance on the representations of the defendant. The court found that the verbal agreement was merely an "agreement to agree." The court also held that because the verbal agreement involved the purchase of land, the agreement was unenforceable in the

---

[1]   A federal court sitting in diversity is bound to apply the choice of law rules of the forum state, namely, Florida. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).

absence of a signed writing.   Finally, the court found that the indefiniteness in the verbal

agreement also defeated any claim for promissory estoppel.  *Id.* at 504.

Plaintiff's allegations clearly show that no enforceable agreement would arise unless the

parties signed a lease, and that there was never any agreement to lease Space B6.2 to Plaintiff.

Plaintiff alleges that: "[o]n July 24, 2003, Mr. Offit sent Mr. Grantz an electronic mail attaching

a lease proposal for the space 'right outside the casino entrance,' also known as 'Space B6.2.'"

Complaint, ¶16.  Plaintiff then alleges that the lease proposal referenced topics such as the

parties' respective contributions for the build-out of the store space, and that Mr. Grantz signed

the lease proposal and returned it to Mr. Offit. Complaint, ¶16.

The "July 24, 2003" electronic mail, attached to this Motion to Dismiss as Exhibit "A"

and which this Court can review on a motion to dismiss,[2] plainly refutes any allegations by

Plaintiff of a binding agreement with respect to Space B6.2.  First, the July 24, 2003 electronic

mail refers to "Space B6.4," and not "Space B6.2." *See* Exhibit "A," attached hereto, page 1 of

Letter of Intent, ¶(c).  Further, the Letter of Intent expressly states on Page 3:

> **The Landlord Reserves the Right to Determine all Tenancies in The Project, and No Tenant Shall Rely On, Nor Does The Landlord Represent, the Tenancy of Any Specific Tenant(s).**
>
> This letter constitutes a term sheet for discussion purposes only and is not intended to be a binding legal agreement and should not be construed as such. This letter will not be binding upon either party, and neither party shall have any obligation to the other, unless or until a legally binding Lease agreement has been executed and delivered by both parties.  The terms and conditions of the Lease document shall be acceptable to both parties in their sole and absolute discretion.

---

[2]        "[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."  *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (attaching District Court Order); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 n. 16 (11th Cir. 1999) (declining to address doctrine); *Caravello v. American Airlines, Inc.*, Case No. 03-62087-CIV, 2004 WL 943207, at *1, *1 (S.D. Fla. April 6, 2004) (considering exhibit attached to memorandum of law in support motion to dismiss based on *Brooks*); *Jackson v. Bellsouth Telecommunications, Inc.*, 181 F. Supp.2d 1345,1354 (S.D. Fla. 2001), *aff'd*, -- F.3d --, 2004 WL 1301078, at *1 (11th Cir. June 14, 2004).

Until such time as an agreement is fully executed and delivered, we reserve the right, for any reason or no reason, to elect not to pursue any or all of the transactions described herein. This letter in no way constitutes a reservation of space within the Development.

. . .

Please execute this letter in the space provided for below indicating your agreement to the above economic terms and conditions. As stated above, please be advised that this letter is not binding on the parties hereto unless and until a Lease is fully executed by the parties. Landlord will promptly send you a lease containing our agreed upon terms once this letter has been executed and returned to the undersigned.

*See* Exhibit "A" to Motion to Dismiss, page 3 (emphasis in original). The letter of intent does not reference Talulah G, a Nevada corporation, as the tenant (only an unnamed entity doing business as Talulah G), and does not reference either Cordish or Sierra as the landlord (only an unjoined entity called PPE Retail, LLC). *See* Exhibit "A," attached hereto, pp. 1, 4. In fact, after Talulah **began negotiating the proposed lease** referenced in the Complaint, Talulah substituted a new entity, **Magda Mena, Inc. as the proposed** tenant.

Plaintiff then alleges that *after* it signed the letter of intent attached to the July 24, 2003 electronic mail (*see* Exhibit "A" above), it relied on a series of promises on "August 6, 2003" or "August 6/8 2003."[3] Moreover, after the alleged promises made on either "August 6, 2003"

---

[3] The pertinent allegations are:

"On or about August 6, 2003, Mr. Grantz had a conversation with Mr. Offit. During their conversation, Mr. Offit told Mr. Grantz that the parties had an agreement regarding the leasing of Space B6.2." Complaint, ¶17.

"In the meantime, from August, 2003 to December, 2003, the parties worked towards finalizing the terms of the lease agreement." *Id.*, ¶18.

"On or about August 6/8, 2003, Mr. Offit, represented to Mr. Grantz that a lease would be executed and that Talulah G should proceed to order inventory for March-April, 2004 and otherwise prepare to open the store." *Id.*, ¶21.

"Mr. Offit was aware of the gravity of his representations, as Mr. Grantz repeatedly emphasized the importance of *reaching an agreement on or before August 8, 2003.*" *Id.*, ¶23 (emphasis added).

(Complaint, ¶17) or "August 6/8, 2003" (*Id.*, ¶21), Plaintiff attaches, and incorporates by reference into Count One, an August 11, 2003 electronic mail from Mr. Offit stating:

> Attached is a *revised proposal* for Talulah G in the Seminole Hard Rock Resort. Highlights of the changes are as follows:
>
> 1.   Rent *was reduced* to $37/sf.
> 2.   Allowance *was increased* to $55/sf.
> 3.   Promo charge *was reduced* to $1/sf.  You will have an obligation to do direct advertisement in lieu of this.
> 4.   Grand opening charge was *reduced* to $1/sf.
> 5.   Percentage rent factor *was reduced* to 5% over a natural breakpoint.
>
> Please sign the LOI and *I will submit it to Reed and Joe for approval after such a lease will be sent.*
>
> Thank you for *your interest* in coming to Paradise!!!

Complaint, Exhibit "B," p. 2 **(emphasis added)**.  The letter of intent attached to the August 11, 2003 electronic mail, **attached hereto as Exhibit "B"** and which this Court can view on a motion to dismiss,[4] **refers again to Space B6.4, not** Space B6.2, and contains the same language quoted above **stating that "neither party shall have** any obligation to the other, unless a binding Lease agreement has been executed and delivered by both parties."  Once again, the August 11, 2003 letter of intent does not reference Talulah G, a Nevada corporation, as the tenant and does not name either Cordish or Sierra as the landlord. *See* Exhibit "B," pp. 1, 4.

Here, Plaintiff's own allegations provide the basis for dismissal.  The allegations of Count One, together with the July 24, 2003 and August 11, 2003 letters of intent expressly referenced in the Complaint reflect that the only "agreement" between Mr. Marc Offit and Mr. Joshua Grantz was that there was no agreement unless both the prospective tenant and landlord signed a lease agreement. *See* Exhibits "A"-"B," attached hereto, p. 3.  Clearly, both letters of intent expressly reference only "Space B6.4," and not "Space B6.2," as alleged by Plaintiff. *Id.*,

---

[4]     *See* footnote 2, *supra.*

p. 1, ¶(c).  Moreover, the text of the August 11, 2003 e-mail (Complaint, Exhibit "A") reflects not only an incomplete "agreement to agree" *after* the date of the alleged representations on August 6/8, 2003, but also that the agreement was expressly subject to the "approval" of others and a "lease."  *Id.*  Under these circumstances, Plaintiff's promissory estoppel claim fails to state a claim upon which relief may be granted because Plaintiff relies only on an unenforceable "agreement to agree" which is, at best, for a space other than Space B6.2.  *See Midtown Realty,* 712 So. 2d at 1351; *Club Eden Roc,* 471 So. 2d at 1324; *Capital Asset Research Corp.,* 743 So. 2d at 44; *Bergman,* 826 So. 2d at 504.

B.      **Plaintiff Is Barred From Relying On A Promise That Is Not "Definite" and "Substantial"**

Plaintiff's claim also fails as a matter of law because Plaintiff has failed to plead a promise that is of "definite and substantial character."  In *W.R. Grace & Co. v. Geodata Serv., Inc.,* 547 So. 2d 919 (Fla. 1989), the Florida Supreme Court set forth the elements of a promissory estoppel claim as [1] a promise or "promises" that are of definite and substantial character; and [2] a showing of justifiable reliance on the promises made.  Here, Plaintiff has failed to plead a promise or promises that are of "definite and substantial character" upon which it could as a matter of law justifiably rely.  *Id.*

This Court has rejected a similar promissory estoppel claim in *Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.,* 262 F. Supp.2d 1334, 1349 (S.D. Fla. 1999), *aff'd,* 235 F.3d 1344 (11th Cir. 2000) (table opinion).  In *Eclipse,* the plaintiff distributors alleged oral promises, after the expiration of an agreement, that the defendant intended "to have a 'long lasting partnership,'" and that "the Distributors would continue to have the exclusive right to sell certain products to their customers in their territories under the Hospital Contracts and otherwise."  *Id.* at 1349-50.  In rejecting this claim, the *Eclipse* court stated:

Here, alleged statements by AHSI that it intended to have a "long lasting partnership" and that the Distributors could "continue" to supply the hospitals under the price protection agreements are also alleged "without any regard...to the termination provision of the contract," and are, as a matter of law, far too indefinite to contradict the unambiguous language in the Agreement. It is impossible for this Court to give a specific meaning to a concept as vague as a "long lasting" partnership. It is equally unclear under exactly what terms "the Distributors would continue to have the right to sell certain products ... under the hospital contracts and otherwise." *See Hygema v. Markley*, 137 Fla. 1, 187 So. 373, 380 (Fla. 1939) (rejecting promissory estoppel claim because the promise "was not definite but, on the contrary, was entirely indefinite as to terms and time."); *Camina Serv. Inc. v. Shell Oil Co.*, 816 F. Supp. 1533, 1540 (S.D. Fla. 1992) (citing *W.R. Grace*, the court held that "application of promissory estoppel may be rejected if the terms of the promise are indefinite.").

*Eclipse*, 262 F. Supp.2d at 1350 (footnote omitted).

Here, as in *Eclipse*, the verbal "promises" upon which Plaintiff relies -- "that the parties had an agreement regarding the leasing of Space B6.2" and "Mr. Offit represented to Mr. Grantz that a lease would be executed" -- are simply far too indefinite to support a promissory estoppel claim.[5]  The allegations supporting the "promises" on August 6 or August 6/8 are too indefinite because the "promises" lack the formal requisites of a lease for commercial space in proximity to a casino development.  This is particularly so because several days after August 6, 2003 or August 6/8, 2003, the parties continued to negotiate over multiple provisions of a revised proposal on a *different* leased space.  *See* Exhibit "B," attached hereto. Given the letters of intent -- Exhibits "A" and "B" -- Plaintiff could not have justifiably relied upon the existence of a binding lease for any space associated with the Hard Rock Hotel, let alone Space B6.2.

**D.     Plaintiff Cannot Hold Cordish Liable As An Agent For A Disclosed
Principal**

Moreover, Defendant Cordish is improperly joined to this case, and should be dismissed

---

[5]     It is important to note that the "promise" upon which Plaintiff relies occurred on August 6, 2003 or August 6/8, 2003, and not with the transmission of the later electronic mail on August 11, 2003.  Complaint, ¶¶21, 23 & Exhibit "B."  Plaintiff specifically alleges that its actions in detrimental reliance on the "promise" occurred on or after "August 8, 2003."  *Id.*, ¶23.

because the July 24, 2003 letter of intent and the August 11, 2003 letter of intent show that the proposed lease was with PPE Retail, LLC, and not Cordish or Sierra. It is clear that, absent an express agreement to the contrary, "an agent working on behalf of a disclosed principal is not personally liable for the debts of the principal" or for the agreements of the principal. *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So. 2d 963, 964 (Fla. 4th DCA 2002); *Kanov v. Bitz*, 660 So. 2d 1165, 1165-66 (Fla. 3d DCA 1995); *Nextel Argentina, S.R.L. v. Elemar Int'l Forwarding, Inc.*, 44 F. Supp.2d 1306, 1309 (S.D. Fla. 1999). This basic principle of agency law has been extended to preclude promissory estoppel claims against agents acting on behalf of disclosed principals. *Croft v. Inlight Risk Management, Inc.*, 2002 WL 31010830, at *1, *5 (N.D. Ill. 2002).[6] Accordingly, because the Exhibits incorporated by reference into the Complaint affirmatively show that both Cordish and Sierra were acting as agents for a disclosed principal, neither can be held liable on a promissory estoppel theory.

## D.    Plaintiff Cannot Circumvent The Statute of Frauds Through A Promissory Estoppel Claim

Plaintiff also has no actionable claim because the alleged promise upon which Plaintiff relies violates Florida's Statute of Frauds for real estate leases, codified at Section 725.01, Florida Statutes. Section 725.01, Florida Statutes, states: "No action shall be brought . . . upon any contract for the sale of lands, tenements or hereditaments, or of any uncertain interest in or concerning them, or for any lease thereof for a period longer than 1 year." Here, Plaintiff has attached no written and signed document authored by Cordish that commits Cordish to the

---

[6]    A copy of this unpublished decision is attached hereto as Exhibit "C."

CASE NO. 04-60735-CIV-MARTINEZ/KLEIN

promise allegedly made on August 6, 2003 (Complaint, ¶17) or August 6/8, 2003 (*Id.*, ¶21).[7]
The July 24, 2003 and August 11, 2003 letters of intent, attached hereto as Exhibits "A"-"B,"
contemplate a lease in excess of one year. *See* Exhibits "A"-"B," attached hereto, p. 1, ¶(e).

Plaintiff cannot avoid the requirements of the Statute of Frauds by pleading a claim for
promissory estoppel. *See Tanenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So. 2d 777, 779
(Fla. 1966); *W.R. Grace*, 547 So. 2d at 925; *Coral Way Properties, Ltd. v. Roses*, 565 So. 2d 372,
373 (Fla. 3d DCA 1990) (promissory estoppel claim based on oral lease violating Section 725.01
is barred); *Eclipse*, 262 F. Supp.2d at 1352 (promissory estoppel claim based on contract
requiring performance in excess of one year barred).   Accordingly, Count One should be
dismissed with prejudice for failure to state a claim.

## II.   Plaintiff's Negligent Misrepresentation Claim Should Be Dismissed With Prejudice For Failure to State A Claim Upon Which Relief May Be Granted

### A.   Plaintiff's Reliance on A Statement That The Parties "Had An Agreement" Or That "A Lease Would Be Executed" Is Unreasonable As A Matter of Law

Plaintiff's alleged reliance on a promise that "the parties had an agreement" (Complaint,
¶17) or "a lease would be executed" (*Id.*, ¶21) is unreasonable and non-actionable as a matter of
law.[8]   Plaintiff's reliance on any verbal representation of an agreement for Space B6.2 on August
6 or August 6/8, 2003 was unreasonable because the July 24, 2003 letter of intent (*see* Exhibit
"A," attached hereto), which Plaintiff asserts it signed (Complaint, ¶16), was for Space B6.4 and

---

[7]   The August 11, 2003 electronic mail attached, in part, to the Complaint as Exhibit "B" is attached
by Plaintiff for purposes of showing Mr. Offit's agency, but not to evidence an agreement in writing.   *See*
Complaint, ¶9.   Indeed, as discussed below, Plaintiff cannot rely on the August 11, 2003 e-mail or its attachment
(*see* Exhibit "B," attached hereto) to satisfy the statute of frauds because it is not signed by the landlord, and does
not obligate either Defendant to anything absent "approval" and a "lease."

[8]   The elements of the cause of action for negligent misrepresentation are (1) "there was a
misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the
misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3)
the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in
justifiable reliance upon the misrepresentation." *Florida Women's Medical Clinic, Inc. v. Sultan*, 656 So. 2d 931,
933 (Fla. 4th DCA 1995).

reflected that no agreement would arise absent a signed lease.  Moreover, any reliance is also unreasonable because, shortly thereafter on August 11, 2003, Plaintiff received another letter of intent (*see* Exhibit "B," attached hereto) pertaining only to Space B6.4 and containing similar language to the July 24, 2003 letter of intent.

The facts of this case are strikingly similar to those of *Rice v. Vitalink Pharmacy Services, Inc.*, 124 F. Supp.2d 343, 345 (W.D.N.C. 2000).  In *Rice*, the court rejected a negligent misrepresentation claim where the plaintiff landlord allegedly relied on a tenant's oral promise that the "deal is a go . . ." and that the legal approval of the lease documents was merely a "rubber stamp." *Id.* at 345.  After the leasing deal fell through, the landlord sued the tenant for promissory estoppel, negligent misrepresentation, and a violation of that state's deceptive and unfair trade practices act.  The court ultimately rejected, albeit through summary judgment, plaintiff's **negligent misrepresentation** claim (as well as the other two claims) because it was unreasonable as a matter of law for the plaintiff landlord to rely on "an alleged oral promise." The reliance is particularly unreasonable because the July 24, 2003 and August 11, 2003 letters of intent provide that PPE Retail, LLC, not Cordish or Sierra, would be the landlord.  Here, Plaintiff's affirmative allegations and the documents referenced in the Complaint provide an adequate basis for dismissal with prejudice at this stage of the proceeding.

**B.      Plaintiff's Negligent Misrepresentation Claim Fails To State A Claim Because Plaintiff Alleges No Actionable Statement of Existing Fact**

Plaintiff's negligent misrepresentation claim in Count Two also fails to state a claim because the alleged promises that "the parties had an agreement" or "a lease would be executed" are non-actionable legal conclusions or future promises.  Complaint, ¶¶17, 21.  The first of the two alleged misrepresentations, that the parties "had an agreement," is a mere legal conclusion, rather than an actionable statement of material fact.  Plaintiff cannot rely on a representation that

is no more than a mere legal conclusion or legal opinion. *Capps Agency, Inc. v. MCI Telecommunications Corp.*, 863 F. Supp. 1555, 1558 (M.D. Fla. 1993); *cf. Mutual Life Ins. Co. of New York v. Phinney*, 178 U.S. 327, 342-43 (1900) (holding that a mere expression of opinion as to a condition of a contract, which is a matter of law, in respect to which both parties are equally chargeable with knowledge, cannot constitute a false representation or deceit).

The other alleged misrepresentation, that "a lease would be executed," also fails because it is a statement of future action or a future promise, rather than a statement of existing material fact, and is not actionable as a mater of law. *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 521 (Fla. 3d DCA 1994) ("Finally, Battaglia alleges that the bank reneged on promises to fund future operations and to assign a mortgage. Yet, failure to perform a promise does not constitute fraud, unless the bank intended not to perform the contract at the time it was entered"). Plaintiff has not alleged fraud in the inducement, nor has Plaintiff alleged a positive intent by Cordish not to perform the promise at the time that the promise was made. Instead, Plaintiff alleges only that "Mr. Offit made the representation knowing it was false or in reckless disregard for the truth." Complaint, ¶28. Consequently, the mere negligent representation that "a lease would be executed" does not fall into the exception for fraudulent promises made within a positive intention not to perform them or with no intention of performing them.

**C.    Plaintiff Cannot Circumvent The Statute of Frauds By Pleading A Negligent Misrepresentation Claim**

Plaintiff cannot circumvent the lack of a signed writing supporting the verbal representations that "a lease would be executed" or that "the parties had an agreement" by pleading a cause of action for negligent misrepresentation. *Conner, I. Inc. v. Walt Disney Co.*, 827 So. 2d 318, 319 (Fla. 5th DCA 2002) (holding that statute of frauds bars negligent misrepresentation claim); *Broward Nat. Bank of Fort Lauderdale v. Bethel*, 341 So. 2d 1012,

1013 (Fla. 4th DCA 1977) ("Mr. Bethel contends that he is suing to recover damages for negligent misrepresentation, but in reality he is seeking indirectly to recover damages predicated upon the breach of an oral lease of land for a period in excess of one year. This he may not do"). Thus, Count Two should be dismissed with prejudice.

## III. Count Three of Plaintiff's Complaint Should Be Dismissed With Prejudice For Failure To State A Claim

### A. Plaintiff, A Non-Florida Resident, Lacks Standing to Sue Under The FDUTPA

Plaintiff lacks standing to sue under the FDUTPA because it is a Nevada corporation (Complaint, ¶5), and the FDUTPA confers no standing on out-of-state residents. *Coastal Physician Services of Broward County, Inc. v. Ortiz*, 764 So. 2d 7, 8 (Fla. 4th DCA 1999) ("Having reviewed the statutory provisions, we conclude that these acts are for the protection of in-state consumers from either in-state or out-of-state debt collectors"); *Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090, 1094 (Fla. 4th DCA 2003) (citing *Coastal Physician Services* with approval in rejecting certification of a nationwide class); *OCE Printing Systems USA, Inc. v. Mailers Data Services, Inc.*, 760 So. 2d 1037, 1042 (Fla. 2d DCA 2000) ("We agree that only in-state consumers can pursue a valid claim under the Unfair Trade Act [FDUTPA]"). Where the "offending conduct" took place partially within Florida and partially outside of Florida and the alleged injuries did not take place entirely within Florida, this Court has held that there is no conflict in Florida law and that a class action predicated on claims of residents of other states could not stand. *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 227 (S.D. Fla. 2002) (adopting Report of Magistrate Judge Lynch).

Indeed, the most recent expression of legislative intent by the Florida Legislature is that the FDUTPA is not intended to protect non-residents. The legislative staff analysis to the 2001

Amendments to the FDUTPA states: "When *Florida consumers (individuals or businesses)* suffer a loss because of a commercial transaction, they can avail themselves of the protections of Florida law through the use of various consumer protection statutes." *Senate Staff Analysis and Economic Impact Statement*, CS/SB 208, COMMITTEE ON COMMERCE AND ECONOMIC OPPORTUNITIES, p. 4 (March 22, 2001, *available at* http://www.flsenate.gov/data/session/2001/Senate/bills/analysis/pdf/2001s0208.cm.pdf) (emphasis added); *accord id.* at 3 ("The task force also recognized the importance of the Florida courts maintaining jurisdiction over perpetrators of crimes *in order to protect Florida businesses and residents.* In addition to the need for changes to criminal laws, the task force stressed that Florida needed to amend its civil laws to protect *its citizens and businesses*") (emphasis added); *id.* at 3 ("**Sellers of goods and services to** *businesses and individuals in Florida* should be **regulated in the same manner, regardless of** the method used to contact or deliver the goods or services to that business or individual") (*quoting 1999 Annual Report to the Legislature,* Information Service Technology Department Task Force, February 14, 2000, p. 82) (emphasis added)); *accord, America Online, Inc. v. Pasieka,* 870 So. 2d 170, 172 (Fla. 1st DCA 2004) (FDUTPA is "designed to afford a broader protection to the citizens of Florida"); *Management Computer Controls, Inc. v. Charles Perry Construction, Inc.,* 743 So. 2d 627, 632 (Fla. 1st DCA 1999) (FDUTPA "seeks to protect Florida citizens from a different kind of evil"). Accordingly, because Plaintiff lacks standing to state a FDUTPA claim, and Plaintiff's status as a non-resident cannot be cured by amendment, Count Three should be dismissed with prejudice.[9]

---

[9]    The exception established by a single District Court of Appeal in *Millenium Communications & Fulfillment, Inc. v. Office of Attorney General, Dept of Legal Affairs,* 761 So. 2d 1256, 1262 (Fla. 3d DCA 2000) is inapplicable in this case. The *Millenium* court held that the FDUTPA *does* apply to out-of-state consumers "where the allegations in this case reflect that the offending conduct *occurred entirely within this state.*" *Id.* (emphasis added). Here, however, although Plaintiff pleads the existence of one Florida-based meeting (Complaint, ¶13), the remainder of the contacts are between Sierra, an Illinois corporation, Cordish, a Maryland corporation, and Plaintiff, a Nevada corporation. *Id.,* ¶¶5, 8, 9. Additionally, in *Hutson,* 837 So. 2d at 1094, the Fourth District "disagree[d]"

**B.    Plaintiff Fails To State An Actionable "Bait And Switch" FDUTPA Claim**

Plaintiff's FDUTPA claim also fails because there can be no "bait and switch" where both the July 24, 2003 and the August 11, 2003 letters of intent were not, as Plaintiff asserts for Space B6.2 and provided that there was no binding obligation until a lease agreement was executed and delivered . *See* Exhibits "A" and "B," attached hereto. Here, there was no "bait" and no "switch."  Under the facts of this case, Plaintiff fails to state a FDUPTA claim because the documents referenced in the Complaint affirmatively refute any "bait and switch" scheme.[10]

Plaintiff only alleges that it relied on an oral representation of the Defendant's agent, and signed a "letter of intent" and negotiated a "lease agreement" for Space B6.2, but both the July 24, 2003 and August 11, 2003 letters of intent clearly show that Plaintiff could not have had any reasonable expectation of an agreement, especially as to Space B6.2.  Here, Plaintiff placed no deposit on Space B6.2, and could not have been deceived by into thinking it had.  The July 24, 2003 and August 11, 2003 letters of intent do not unequivocally represent that Plaintiff was given the opportunity to lease Space B6.2 at a firm price.  To the contrary, those letters of intent relate only to Space B6.4, and expressly condition the existence of any agreement on the execution and delivery of a lease agreement.  Accordingly, Plaintiff's FDUTPA count fails to state a claim and should be dismissed with prejudice.

___

with the suggestion of the Third District in *Millenium*, 761 So. 2d at 1262, that the Fourth District had "receded" from its prior decision in *Coastal Physician Services*, 764 So. 2d at 7, in an intervening decision. Consequently, this Court is not bound to follow the minority decision in *Millenium*, 761 So. 2d at 1262, because that exception is inapplicable under the facts alleged in the Complaint. *Accord, Montgomery*, 209 F.R.D. at 227.

[10]    Where, as here, a FDUTPA claim sounds in fraud, it is subject to Rule 9(b). *Cannon v. Metro Ford, Inc.*, 242 F. Supp.2d 1322, 1332 (S.D. Fla. 2002) (FDUTPA claim dismissed for failure to meet heightened particularity requirements of Rule 9(b)); *Stires v. Carnival Corp.*, 243 F. Supp.2d 1313, 1321 (M.D. Fla. 2002) ("Most courts construing claims alleging violations of the Federal Deceptive Trade Practices Act or its state counterparts have required the heightened pleading standard requirements of Rule 9(b)").

### C.   Plaintiff Cannot Circumvent The Statute of Frauds By Pleading A FDUTPA Violation

Assuming that Plaintiff is able to survive these fatal defects in the FDUTPA claim, allowing Plaintiff to enforce an unenforceable verbal promise to convey a leasehold interest through a FDUTPA claim would eviscerate the purpose of the Statute of Frauds. As this Court has made clear in the *Eclipse* case, 262 F. Supp.2d at 1345-46, the Statute of Frauds is equally applicable to *all* claims:

> Indeed, Florida law explicitly prohibits a plaintiff from reformulating an oral contract as a misrepresentation for the purpose of avoiding the Statute of Frauds. *See Ostman v. Lawn*, 305 So. 2d 871 (Fla. 3d DCA 1974). The way a plaintiff fashions a claim does not determine the applicability of the Statute. Because the Statute "bars any claim which requires as its gravamen, proof of a promise or agreement" not reduced to writing, "[t]here is no distinction between an action ex contractu and an action ex delicto in this regard." *Id.* at 872.

Here, Plaintiff's FDUTPA claim requires direct proof of a promise violating the Statute of Frauds. All of the underlying allegations of the Complaint are incorporated into Plaintiff's FDUTPA claim. Complaint, ¶33. The conduct alleged in support of Counts One and Two is the exact same conduct forming the basis for the FDUTPA claim. In the absence of a signed writing obligating Cordish to lease Space B6.2, as opposed to Space B6.4, Plaintiff's FDUTPA claim is barred by the Statute of Frauds.

**WHEREFORE**, Defendant THE CORDISH COMPANY respectfully requests the entry of an Order dismissing the Complaint with prejudice, awarding attorneys' fees and costs in favor of Defendant Cordish and against Plaintiff as provided in Section 501.2105, Florida Statutes, and for such other and further relief as this Court deems just and appropriate.

CASE NO. 04-60735-CIV-MARTINEZ/KLEIN

Respectfully submitted,

GREENBERG TRAURIG, P.A.
Attorneys for Defendant The Cordish Company
401 East Las Olas Blvd.
Suite 2000
Fort Lauderdale, FL 33301
Telephone:  (954) 765-0500
Telecopy:   (954) 765-1477


By: _____
    JEFFREY ALLAN HIRSCH
    Florida Bar Number 199850
    JOHN L. MCMANUS
    Florida Bar Number 0119423

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by U.S. Mail to **Michael R. Holt, Esq., Rumberger**, Kirk & Caldwell, Brickell Bayview Centre, Suite 3000, 80 S.W. 8th Street, Miami, Florida 33130-3047 and Richard S. Geller, Esq., Lincoln Plaza, Suite 1400, 300 South Orange Avenue, Orlando, Florida 32802-1873 on this ⎰ˢᵗ day of July 2004.


_____
JEFFREY ALLAN HIRSCH

FL-FLL-MCMANUSJ-323007x01-F-NV01  DOC-7/1/04547797-012200

## Marc Offit

**From:** Marc Offit [marc@sierraadvisors.com]

**Sent:** Thursday, July 24, 2003 2:15 PM

**To:** 'joshua@talulahg.com'

**Cc:** 'Reed Cordish'; 'Joe Weinberg'

**Subject:** Lease proposal for the Hard Rock Resort

Josh

Attached is a lease proposal for the Hard Rock. The space is right outside the casino entrance. Please call me to discuss.

Marc

-----------------------------------------

Marc Offit
Sierra Realty Advisors
2121 Waukegan Rd, Suite 100
Bannockburn, IL 60015
(847) 940-7455 Phone
(847) 940-7895 Fax
(847) 757-5959 Cell
marc@sierraadvisors.com



# PPE RETAIL, LLC

---

The Cordish Company
The Power Plant
601 East Pratt Street
6ᵗʰ Floor
Baltimore, MD 21202
410-752-5444
Fax: 410-659-9491
E-mail: marc@cordish.com

July 24, 2003

VIA EMAIL
Joshua Grantz
Talulah G
3200 Las Vegas Blvd South
Suite 1180
Las Vegas, NV 89109

Re: Proposed Lease (the "Lease") By and Between
PPE Retail, LLC (the "Landlord") and
_____ d/b/a Talulah G ("Tenant") in the
Paradise at the Seminole Hard Rock Resort Project
(the Development"), Hollywood, FL.

Dear Josh:

The following outlines a business proposal for the above referenced Lease. We are willing to consider leasing certain premises (the "Premises") in the Development to Tenant under the following basic terms:

(a) Estimated Opening Date. Landlord anticipates the Development to open in June 2004.

(b) Tenant/Guarantor: To be determined following receipt of financials.

(c) Premises. The Premises shall total approximately 1,476 square feet of building in the Development as indicated on the attached plan as Space B6.4.

(d) Landlord's Work/Tenant's Work. Landlord shall deliver the Premises to Tenant in accordance with the attached Exhibit B. Tenant's Work will be defined to include, but not limited to, all interior improvements and FF&E necessary to complete a current prototype optical retail store.

(e) Term. The Term of the Lease shall be five (5) years (the "Term") with 1 five year renewal option. Rent shall commence ("Rent Commencement Date") on the earlier to occur of (a) sixty (60) days after Landlord shall have delivered Premises to Tenant with Landlord's Work substantially completed ("Possession Date") or (b) Tenant's opening of the Premises for

Joshua Grantz
July 24, 2003
Page #2

business.

(f)     Minimum Rent.  Tenant shall pay Minimum Rent based on the following annual rental per square foot in equal monthly installments on the first day of each calendar month in advance:

| Year(s) | Annual Rent/Square Foot |
|---------|-------------------------|
| 1-5     | $40                     |
| 6-10    | $45                     |

(g)     Percentage Rent.  Tenant shall pay percentage rent equal to six percent (6%) of gross sales over a natural breakpoint.

(h)     Construction Allowance.  Landlord shall contribute the sum of $50/sf towards the construction of the tenant's space in the building. Allowances shall be paid upon completion of the tenant's space and the submittal of final lien waiver's and a certificate of occupancy. Tenant agrees to provide a guaranty for the repayment of the construction allowance to be amortized over the initial lease term

(i)     Common Area Maintenance and Insurance.  Tenant shall pay its pro rata share of the cost of maintaining the common areas and insurance of the shopping center, currently estimated at $5.00/ square foot.

(j)     Taxes.  Currently there are no taxes on the Development. If taxes are assessed, tenant shall pay its pro rata share of the cost of taxes on the Development.

(k)     Utilities.  Tenant shall pay all electricity, gas, water, sewer and telephone utility charges directly to the supplier of such utilities as metered and billed.

(l)     Promotion.  Tenant shall advertise and promote the Premises in a first class manner that is substantially similar to other existing operations.  Tenant agrees to use the name of the Development in all promotions (i.e. "Weston Jewelers at Seminole Paradise"). Tenant shall pay $2.50/square foot towards the advertising fund of the shopping center

(m)     Grand Opening Fee. Tenant shall pay $2.50/square foot ninety (90) days prior to Grand Opening.

(n)     Deposit. Tenant shall deposit into an interest bearing account the equivalent of one (1) month of total rental obligations (the "Deposit").  The Deposit shall be returned to Tenant, with interest, at the Termination of the Lease assuming there is no event of default by Tenant.

(o)     Rental Deposit.  Tenant shall deposit the equivalent of one (1) month of total rental obligations (the "Rental Deposit").  The Deposit shall be applicable to Rent due at the commencement of Tenant's term, assuming there is no event of default by Tenant.

(p)     Radius Restriction.  Tenant shall not locate another store within five (5) miles of Landlord's

Joshua Grantz
July 24, 2003
Page #3

Development.

(q)    <u>Use of Premises.</u>  The Premises may only be used for a boutique selling women's clothing and accessories similar to the store in Fashion Show Mall.

(r)    <u>Signage.</u>  Tenant must have exterior signage designed to promote Tenant's visibility and identity.  Tenant shall work cooperatively with Landlord in the design of all signage.

(s)    <u>Construction.</u>  Landlord and Tenant acknowledge that Landlord is building a new building and that Landlord shall have other construction projects on the Development.  Tenant's Work shall be coordinated with Landlord's construction and Tenant's Premises shall be at all times completed according to Tenant's plans and specifications which have been approved by Landlord as provided above.

(t)    <u>Brokerage.</u> Landlord and Tenant acknowledge that no broker has been involved in this transaction.

(u)    <u>Documentation.</u> Landlord will prepare the first draft of the lease.

**The Landlord Reserves the Right to Determine all Tenancies in The Project, and No Tenant Shall Rely On, Nor Does The Landlord Represent, the Tenancy of Any Specific Tenant(s).**

This letter constitutes a term sheet for discussion purposes only and is not intended to be a binding legal agreement and should not be construed as such.  This letter will not be binding upon either party, and neither party shall have any obligation to the other, unless or until a legally binding Lease agreement has been executed and delivered by both parties.  The terms and conditions of the Lease document shall be acceptable to both parties in their sole and absolute discretion.  Until such time as an agreement is fully executed and delivered, we reserve the right, for any reason or no reason, to elect not to pursue any or all of the transactions described herein.  This letter in no way constitutes a reservation of space within the Development.

Please execute this letter in the space provided for below indicating your agreement to the above economic terms and conditions.  As stated above, please be advised that this letter is not binding on the parties hereto unless and until a Lease is fully executed by the parties.  Landlord will promptly send you a lease containing our agreed upon terms once this letter has been executed and returned to the undersigned.

**The terms of this economic proposal are valid for a period of ten (10) business days from the date above.**  Please review this proposal at your earliest opportunity and if you have any questions feel free to call me.  I look forward to speaking with you soon.

Sincerely,

Joshua Grantz
July 24, 2003
Page #4

Marc Offit


AGREED AND ACCEPTED THIS __ DAY OF _____, 2003.


LANDLORD

PPE RETAIL, LLC


By: _____ _____ _____
Joseph Weinberg, Vice President


TENANT

By: _____ _ _____

Joshua Grantz
July 24, 2003
Page #5

EXHIBIT B-2

WHITE BOX
DESCRIPTION OF LANDLORD'S WORK

A.    GENERAL These specifications are prepared to aid Tenant in preparing and executing Tenant's improvement plan. Tenant should refer to the building plans and specifications indicated on the Lease Outline Drawing or As-Built Drawing (herein referred to as L.O.D.) provided by Landlord, and confirm all measurements and as-built conditions with Landlord's tenant coordinator, and by visual inspection of the Premises before starting construction. In cases where these requirements are in conflict with Landlord's completed building plans or completed buildings, information in the completed building plans or completed building shall take precedence over these requirements. Prior to starting construction, Tenant shall provide completed working drawings and specifications for the construction of the Premises, in a preliminary and then final submission in order to receive Landlord's written approval. Tenant's contractor must be approved by Landlord prior to the start of construction.

B.    LANDLORD'S WORK (NOTE: IF THE LEASE STATES THAT THE PREMISES ARE BEING DELIVERED IN "AS-IS" CONDITION, THEN LANDLORD'S WORK AS DESCRIBED IN NOS. 1-12 HEREIN BELOW SHALL NOT BE PERFORMED BY LANDLORD EXCEPT IN THE EVENT OF CASUALTY.)

    1.    Demising Partitions

        Partitions between Tenant and exit/service corridors shall be one (1) hour rated construction with 5/6" drywall on both sides where applicable. Demising partitions between Tenant and other tenants shall be one (1) hour rated dry wall/metal stud construction. Dry wall will be installed on both sides of the partition and shall extend from the finished floor slab to the underside of the steel structure and/or existing ceiling. All walls up to Landlord's standard ceiling height, will be taped, spackled, sanded smooth, and ready for tenant's paint finish (prime and finish coats) Tenant shall provide all other interior drywall partitions and finishes above and beyond the perimeter walls. The rear wall of the Premises shall not be provided with drywall.

    2.    Stockroom Partition

        Furnish and install a straight partition wall running parallel to the exterior rear wall of the Premises, which wall shall extend from floor to acoustical ceiling, consisting of 3 5/8' steel studs with 5/6" gypsum board on both sides, taped, sanded, and ready for Tenant's finish. If no acoustical ceiling, stockroom partition will be constructed to underside of roof deck. One 3'O' hollow core door with standard passage hardware into stockroom will be provided. If the location of the partition wall results in a relocation of or additional sprinkler heads, the cost of such relocation or additional sprinkler heads shall be borne by Tenant. Stockroom location cannot interfere with emergency exit requirements.

Joshua Grantz
July 24, 2003
Page #6

3.  **Storefront**

    Furnish and install a pre-finished glass and aluminum storefront, with double doors, including standard construction lockset hardware, doors to be in location shown on L.O.D.

    A gypsum board and metal Stud return will be installed above the storefront and across the interior front of the Premises. If no acoustical ceiling, an access panel to the signage "J" box will be provided. The area below the storefront shall be finished to the floor with drywall.

4.  **Floor Slabs**

    Four-inch (4") average concrete slab on grade designed to support a live load of 75 pounds per square foot. No depressions, recesses, or penetrations in floor system will be permitted without prior written permission from Landlord.

5.  **Egress Door**

    An exterior service door or a service corridor egress door, if any, with construction hardware, only if required by the jurisdictional authorities or Landlord's insurance carrier. The location of such egress door, if any, shall be as indicated on the L.O.D

6.  **Fire Protection Sprinklers**

    A fire protection sprinkler system, including feed and/or cross mains and branch lines, installed in a grid pattern, shall be located within the Premises, at an elevation indicated on the L.O.D. The quantity of base building standard fire protection sprinkler heads provided by Landlord shall be the minimum required by code or governing agencies up to a maximum coverage of one (1) head per 140 square feet of Tenant's Floor Area. Additional installation or relocation of sprinkler heads required due to Tenant layout, storerooms, offices, dressing rooms, etc. shall be performed by Landlord at Tenant's expense. Tenant plans must be received prior to sprinkler system design and fabrication to avoid costs associated with sprinkler modifications. (SEE SECTION E.2)

7.  **Ceiling**

    Exposed to underside of floor/roof above.

8.  **HVAC Equipment**

    Landlord-supplied HVAC system in accordance with applicable codes including thermostat. All roof top units and air distribution systems for Tenant spaces will be designed, furnished and installed by Landlord. Additional roof top curbs or penetrations, or thermostat relocations shall be performed by Landlord at Tenant's expense.

    Internal loading exceeding that referenced above and requiring additional equipment and/or revised design shall be performed by Landlord at Tenant's expense.

Joshua Grantz
July 24, 2003
Page #7

9.    Electrical

(a)Landlord will provide an individually metered, 30 circuit, 200-amp electric service panel rated at either 120/208 volts or 277/480 volts 3 phase. If the electric service supplied by the local utility is rated at 277/480 volts, a step down transformer will be installed to reduce the voltage to 120/208 volts for distribution. This transformer shall supply a 100-amp 3 phase 24 circuit panel.

(b) Duplex convenience outlets will be install in the demising partition walls at a rate of one per 30 feet.

(c) Hung 2' x 4' acrylic florescent, 120 or 277 volt, 4 amp electronic fixtures at the approximate rate of one fixture per 100 square feet of leased area.

(d)Landlord will provide one sign circuit to front of tenants space which will be controlled by a single  pole time clock and terminated in a junction box and labeled a sign circuit.

(e)Emergency lighting and exit signs per code as indicated on the L.O.D. Additional lighting and signs shall be provided by Landlord at Tenant's expense based on Landlord's cost plus 15% for administration.

10.    Utilities

(a) Telephone - An empty telephone conduit (with pull string) shall be installed from the Premises to a telephone room located within the common area of the building. Individual telephone backboards, switchgear, wiring, equipment installation and services are not supplied by Landlord, and shall be part of Tenant's Work or, at Tenant's option. Landlord will supply same at Tenant's expense based on Landlord's cost plus 15% for administration.

(b) Gas - Landlord may arrange with the local utility providing gas service to bring gas service to a service/metering point in the Shopping Center. Any available gas service, including the quantity thereof, will depend upon the availability of gas provided to Landlord's Building by the utility company. Landlord makes no warranty as to the quantity of gas available. Landlord reserves the right to allocate gas service within Landlord's Building if the utility company limits the quantities of gas supplied to Landlord's Building. Tenants requiring gas shall arrange with the local utility providing gas service for a service meter at the point indicated on the L.O.D.

11. ·  Toilet Room

ADA Toilet Room(s), as required by local code, including sink, toilet, install-hot water heater, exhaust fan. VCT/BASE, mirror, and toilet paper dispenser.

( )          ( )

## Marc Offit

| | |
|---|---|
| **From:** | Marc Offit [marc@sierraadvisors.com] |
| **Sent:** | Monday, August 11, 2003 4:00 PM |
| **To:** | 'joshua@talulahg.com'; 'Joshua Grantz' |
| **Subject:** | Revised proposal for the Hard Rock project |

Josh

Attached is a revised proposal for Talulah G in the Seminole Hard Rock Resort. Highlights of the changes are as follows:

1.  Rent was reduced to $37/sf.
2.  Allowance was increased to $55/sf.
3.  Promo charge was reduced to $1/sf. You will have an obligation to do direct advertisement in lieu of this.
4.  Grand opening charge was reduced to $1/sf.
5.  Percentage rent factor was reduced to 5% over a natural breakpoint.

Please sign the LOI and I will submit it to Reed and Joe for approval after such a lease will be sent.

Thank you for your interest in coming to Paradise!!!

-------------------------------------------------
Marc Offit
Sierra Realty Advisors
2121 Waukegan Rd, Suite 100
Bannockburn, IL 60015
(847) 940-7455 Phone
(847) 940-7895 Fax
(847) 757-5959 Cell
marc@sierraadvisors.com



EXHIBIT
B

5/26/2004

# PPE RETAIL, LLC

---

The Cordish Company
The Power Plant
601 East Pratt Street
6th Floor
Baltimore, MD 21202
410-752-5444
Fax: 410-659-9491
E-mail: marc@cordish.com

August 11, 2003

VIA EMAIL
Joshua Grantz
Talulah G
3200 Las Vegas Blvd South
Suite 1180
Las Vegas, NV 89109

      Re: Proposed Lease (the "Lease") By and Between
      PPE Retail, LLC (the "Landlord") and
      _____ d/b/a Talulah G ("Tenant") in the
      Paradise at the Seminole Hard Rock Resort Project
      (the Development"), Hollywood, FL.

Dear Josh:

The following outlines a business proposal for the above referenced Lease. We are willing to consider leasing certain premises (the "Premises") in the Development to Tenant under the following basic terms:

(a)  Estimated Opening Date. Landlord anticipates the Development to open in June 2004.

(b)  Tenant/Guarantor:  To be determined following receipt of financials.

(c)  Premises. The Premises shall total approximately 1,476 square feet of building in the Development as indicated on the attached plan as Space B6.4.

(d)  Landlord's Work/Tenant's Work. Landlord shall deliver the Premises to Tenant in accordance with the attached Exhibit B. Tenant's Work will be defined to include, but not limited to, all interior improvements and FF&E necessary to complete a current prototype optical retail store.

(e)  Term. The Term of the Lease shall be five (5) years (the "Term") with 1 five year renewal option. Rent shall commence ("Rent Commencement Date") on the earlier to occur of (a) ninety (60) days after Landlord shall have delivered Premises to Tenant with Landlord's Work substantially completed ("Possession Date") or (b) Tenant's opening of the Premises for

Joshua Grantz
August 11, 2003
Page #2

business.

(f)     <u>Minimum Rent.</u> Tenant shall pay Minimum Rent based on the following annual rental per square foot in equal monthly installments on the first day of each calendar month in advance:

| Year(s) | Annual Rent/Square Foot |
|---------|-------------------------|
| 1-5     | $37                     |
| 6-10    | $45                     |

(g)     <u>Percentage Rent.</u> Tenant shall pay percentage rent equal to five percent (5%) of gross sales over a natural breakpoint.

(h)     <u>Construction Allowance.</u> Landlord shall contribute the sum of $55/sf towards the construction of the tenant's space in the building. Allowances shall be paid upon completion of the tenant's space and the submittal of final lien waiver's and a certificate of occupancy. Tenant agrees to provide a guaranty for the repayment of the construction allowance to be amortized over the initial lease term

(i)     <u>Common Area Maintenance and Insurance.</u> Tenant shall pay its pro rata share of the cost of maintaining the common areas and insurance of the shopping center, currently estimated at $5.00/ square foot.

(j)     <u>Taxes.</u> Currently there are no taxes on the Development. If taxes are assessed, tenant shall pay its pro rata share of the cost of taxes on the Development.

(k)     <u>Utilities.</u> Tenant shall pay all electricity, gas, water, sewer and telephone utility charges directly to the supplier of such utilities as metered and billed.

(l)     <u>Promotion.</u> Tenant shall advertise and promote the Premises in a first class manner that is substantially similar to other existing operations. Tenant agrees to use the name of the Development in all promotions (i.e. "Weston Jewelers at Seminole Paradise"). Tenant shall pay $1.00/square foot towards the advertising fund of the shopping center

(m)     <u>Grand Opening Fee.</u> Tenant shall pay $1.00/square foot ninety (90) days prior to Grand Opening.

(n)     <u>Deposit.</u> Tenant shall deposit into an interest bearing account the equivalent of one (1) month of total rental obligations (the "Deposit"). The Deposit shall be returned to Tenant, with interest, at the Termination of the Lease assuming there is no event of default by Tenant.

(o)     <u>Rental Deposit.</u> Tenant shall deposit the equivalent of one (1) month of total rental obligations (the "Rental Deposit"). The Deposit shall be applicable to Rent due at the commencement of Tenant's term, assuming there is no event of default by Tenant.

(p)     <u>Radius Restriction.</u> Tenant shall not locate another store within five (5) miles of Landlord's

Joshua Grantz
August 11, 2003
Page #3

Development.

(q)   Use of Premises.  The Premises may only be used for a boutique selling women's clothing and accessories similar to the store being designed for Fashion Show Mall.

(r)   Signage.  Tenant must have exterior signage designed to promote Tenant's visibility and identity.  Tenant shall work cooperatively with Landlord in the design of all signage.

(s)   Construction.  Landlord and Tenant acknowledge that Landlord is building a new building and that Landlord shall have other construction projects on the Development.  Tenant's Work shall be coordinated with Landlord's construction and Tenant's Premises shall be at all times completed according to Tenant's plans and specifications which have been approved by Landlord as provided above.

(t)   Brokerage.  Landlord and Tenant acknowledge that no broker has been involved in this transaction.

(u)   Documentation.  Landlord will prepare the first draft of the lease.

**The Landlord Reserves the Right to Determine all Tenancies in The Project, and No Tenant Shall Rely On, Nor Does The Landlord Represent, the Tenancy of Any Specific Tenant(s).**

This letter constitutes a term sheet for discussion purposes only and is not intended to be a binding legal agreement and should not be construed as such.  This letter will not be binding upon either party, and neither party shall have any obligation to the other, unless or until a legally binding Lease agreement has been executed and delivered by both parties.  The terms and conditions of the Lease document shall be acceptable to both parties in their sole and absolute discretion.  Until such time as an agreement is fully executed and delivered, we reserve the right, for any reason or no reason, to elect not to pursue any or all of the transactions described herein.  This letter in no way constitutes a reservation of space within the Development.

Please execute this letter in the space provided for below indicating your agreement to the above economic terms and conditions.  As stated above, please be advised that this letter is not binding on the parties hereto unless and until a Lease is fully executed by the parties.  Landlord will promptly send you a lease containing our agreed upon terms once this letter has been executed and returned to the undersigned.

**The terms of this economic proposal are valid for a period of ten (10) business days from the date above.**  Please review this proposal at your earliest opportunity and if you have any questions feel free to call me.  I look forward to speaking with you soon.

Sincerely,

Joshua Grantz
August 11, 2003
Page #4

Marc Offit


AGREED AND ACCEPTED THIS __ DAY OF _____, 2003.


LANDLORD

PPE RETAIL, LLC


By: _____
Joseph Weinberg, Vice President



TENANT


By:_____

Joshua Grantz
August 11, 2003
Page #5

## EXHIBIT B-2

## WHITE BOX
## DESCRIPTION OF LANDLORD'S WORK

A.  **GENERAL** These specifications are prepared to aid Tenant in preparing and executing Tenant's improvement plan. **Tenant should refer to the** building plans and specifications indicated on the **Lease Outline Drawing or As-Built Drawing (herein** referred to as L.O.D.) provided by Landlord, and **confirm all measurements and as-built conditions with** Landlord's tenant coordinator, and by visual inspection of the Premises before **starting construction.** In cases where these requirements are in conflict with Landlord's completed building plans or completed buildings, information in the completed building plans or completed building shall take precedence over these requirements. Prior to starting construction, Tenant shall provide completed working drawings and specifications for the construction of the Premises, in a preliminary and then final submission in order to receive Landlord's written approval. Tenant's contractor must be approved by Landlord prior to the start of construction.

B.  LANDLORD'S WORK (NOTE: IF THE LEASE STATES THAT THE PREMISES ARE BEING DELIVERED IN "AS-IS" CONDITION, THEN LANDLORD'S WORK AS DESCRIBED IN NOS. 1-12 HEREIN BELOW SHALL NOT BE PERFORMED BY LANDLORD EXCEPT IN THE EVENT OF CASUALTY.)

   1.  Demising Partitions

      Partitions between Tenant and exit/service corridors shall be one (1) hour rated construction with 5/6" drywall on both sides where applicable. Demising partitions between Tenant and other tenants shall be one (1) hour rated dry wall/metal stud construction. Dry wall will be installed on both sides of the partition and shall extend from the finished floor slab to the underside of the steel structure and/or existing ceiling. All walls up to Landlord's standard ceiling height, will be taped, spackled, sanded smooth, and ready for tenant's paint finish (prime and finish coats) Tenant shall provide all other interior drywall partitions and finishes above and beyond the perimeter walls. The rear wall of the Premises shall not be provided with drywall.

   2.  Stockroom Partition

      Furnish and install a straight partition wall running parallel to the exterior rear wall of the Premises, which wall shall extend from floor to acoustical ceiling, consisting of 3 5/8' steel studs with 5/6" gypsum board on both sides, taped, sanded, and ready for Tenant's finish. If no acoustical ceiling, stockroom partition will be constructed to underside of roof deck. One 3'0' hollow core door with standard passage hardware into stockroom will be provided. If the location of the partition wall results in a relocation of or additional sprinkler heads, the cost of such relocation or additional sprinkler heads shall be borne by Tenant. Stockroom location cannot interfere with emergency exit requirements.

   3.  Storefront

Joshua Grantz
August 11, 2003
Page #6

Furnish and install a pre-finished glass and aluminum storefront, with double doors, including standard construction lockset hardware, doors to be in location shown on L.O.D.

A gypsum board and metal Stud return will be installed above the storefront and across the interior front of the Premises. If no acoustical ceiling, an access panel to the signage "J" box will be provided. The area below the storefront shall be finished to the floor with drywall.

4.    Floor Slabs

Four-inch (4") average concrete slab on grade designed to support a live load of 75 pounds per square foot. No depressions. recesses, or penetrations in floor system will be permitted without prior written permission from Landlord.

5.    Egress Door

An exterior service door or a service corridor egress door, if any, with construction hardware, only if required by the jurisdictional authorities or Landlord's insurance carrier. The location of such egress door, if any, shall be as indicated on the L.O.D

6.    Fire Protection Sprinklers

A fire protection sprinkler system, including feed and/or cross mains and branch lines, installed in a grid pattern, shall be located within the Premises, at an elevation indicated on the L.O.D. The quantity of base building standard fire protection sprinkler heads provided by Landlord shall be the minimum required by code or governing agencies up to a maximum coverage of one (1) head per 140 square feet of Tenant's Floor Area. Additional installation or relocation of sprinkler heads required due to Tenant layout, storerooms, offices, dressing rooms, etc. shall be performed by Landlord at Tenant's expense. Tenant plans must be received prior to sprinkler system design and fabrication to avoid costs associated with sprinkler modifications. (SEE SECTION E.2)

7.    Ceiling

Exposed to underside of floor/roof above.

8.    HVAC Equipment

Landlord-supplied HVAC system in accordance with applicable codes including thermostat. All roof top units and air distribution systems for Tenant spaces will be designed, furnished and installed by Landlord. Additional roof top curbs or penetrations, or thermostat relocations shall be performed by Landlord at Tenant's expense.

Internal loading exceeding that referenced above and requiring additional equipment and/or revised design shall be performed by Landlord at Tenant's expense.

9.    Electrical

Joshua Grantz
August 11, 2003
Page #7

(a)Landlord will provide an individually metered, 30 circuit, 200-amp electric service panel rated at either 120/208 volts or 277/480 volts 3 phase. If the electric service supplied by the local utility is rated at 277/480 volts, a step down transformer will be installed to reduce the voltage to 120/208 volts for distribution. This transformer shall supply a100-amp 3 phase 24 circuit panel.

(b) Duplex convenience outlets will be install in the demising partition walls at a rate of one per 30 feet.

(c) Hung 2' x 4' acrylic florescent, 120 or 277 volt, 4 amp electronic fixtures at the approximate rate of one fixture per 100 square feet of leased area.

(d)Landlord will provide one sign circuit to front of tenants space which will be controlled by a single pole time clock and terminated in a junction box and labeled a sign circuit.

(e)Emergency lighting and exit signs per code as indicated on the L.O.D. Additional lighting and signs shall be provided by Landlord at Tenant's expense based on Landlord's cost plus 15% for administration.

10.  Utilities

(a) Telephone - An empty telephone conduit (with pull string) shall be installed from the Premises to a telephone room located within the common area of the building. Individual telephone backboards, switchgear, wiring, equipment installation and services are not supplied by Landlord, and shall be part of Tenant's Work or, at Tenant's option. Landlord will supply same at Tenant's expense based on Landlord's cost plus 15% for administration.

(b) Gas - Landlord may arrange with the local utility providing gas service to bring gas service to a service/metering point in the Shopping Center. Any available gas service, including the quantity thereof, will depend upon the availability of gas provided to Landlord's Building by the utility company. Landlord makes no warranty as to the quantity of gas available. Landlord reserves the right to allocate gas service within Landlord's Building if the utility company limits the quantities of gas supplied to Landlord's Building. Tenants requiring gas shall arrange with the local utility providing gas service for a service meter at the point indicated on the L.O.D.

11.  Toilet Room

ADA Toilet Room(s), as required by local code, including sink, toilet, install hot water heater, exhaust fan. VCT/BASE, mirror, and toilet paper dispenser.

(C) 2004 West Group                                        Page    2

Citation                                          Database        Mode
Not Reported in F.Supp.2d          FOUND DOCUMENT   DCT            Page
(Cite as: 2002 WL 31010830 (N.D.Ill.))


Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.
Turner Lloyd CROFT Plaintiff,
v.
INLIGHT RISK MANAGEMENT, INC., Development Specialists, Inc., as Assignee for
the Benefit of the Creditors of Physician Dynamics, Inc ., PD Insurance
Holdings, Inc., Physician Dynamics Insurance Co., Inc ., David B. Loucks,
Rodman A. Frates, C.L. Frates & Co., Inc. and Jerry D. Messick, Defendants.
No. 01 C 1766.
Sept. 9, 2002.
Former employee brought action against employer, and employer's corporate
affiliates alleging violation of the Age Discrimination in Employment Act
(ADEA), and state law claims for promissory estoppel, promissory fraud, and
tortious interference with economic advantage. Employer moved for summary
judgment. The District Court, Kennelly, J., held that: (1) summary judgment
affidavit was insufficient to prove that employer met threshold requirement
for "employer" under the ADEA; (2) employee failed to establish that employer
employed at least 20 persons for at least 20 weeks, barring ADEA claim; (3)
exercise of supplemental jurisdiction over state law claims was appropriate;
(4) genuine issues of material fact precluded summary judgment in promissory
estoppel claim; (5) supervisor was not personally liable in promissory estoppel
claim; (6) promissory fraud claim was barred; and (7) claim for tortious
interference with economic advantage was barred.
 Motions granted in part, and denied in part.
West Headnotes

[1] Federal Civil Procedure k2539
        170Ak2539

Summary judgment affidavit with attached list of persons names failed to
establish that corporation had 20 or more employees, and thus, affidavit was
insufficient to prove that corporation met threshold requirement for "employer"
under the ADEA; affidavit included little explanation regarding what
information document contained, document itself was barely legible, and even
assuming that document listed persons entitled to receive stock in corporation,
that would have no bearing on whether or not listed persons were employees of
the corporation. Age Discrimination in Employment Act of 1967, s 11(b), 29
U.S.C.A. s 630(b). .

[2] Civil Rights k1111
        78k1111
          (Formerly 78k169)



Employee failed to establish that employer and its corporate affiliates
employed at least 20 persons, for at least 20 weeks, during year that employee
was terminated, precluding employee's claim under the ADEA.  Age Discrimination
Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                          Page    3

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830 (N.D.Ill.))**
in Employment Act of 1967, s 11(b), 29 U.S.C.A. s 630(b).

[3] Federal Courts k18
        170Bk18

District court's discretionary exercise of supplemental federal jurisdiction
over employee's state law claims against employer, following dismissal of his
federal claims, was appropriate, in consideration of principles of economy,
convenience, **fairness, and comity;** parties had undergone months of discovery,
and court had heard **motions to dismiss** and motions for summary judgment, by
which it gained great deal of familiarity with facts and legal issues.  28
U.S.C.A. s 1367(c).

[4] Federal Civil Procedure k2497.1
        170Ak2497.1

Genuine issues of material fact as to whether employer made certain promises to
employee, other than salary, title, and benefits, which were not fulfilled, and
whether employee **reasonably relied on** those promises in deciding to relocate
and accept new **position with employer,** precluded summary judgment in employee's
claim against **employer for promissory** estoppel under Illinois law.

[5] Principal and Agent k136(2)
        308k136(2)

Former employee's supervisor was not personally liable in employee's claim for
promissory estoppel, under Illinois law, arising out of employee's relocation
and acceptance of new position with employer as a result of employee's
purported reliance on certain promises made by employer, where supervisor made
alleged promises as agent of employer.

[6] Fraud k12
        184k12

Employee could not **prove that employer** made false promises to employee not
intending to keep them, in **order** to induce employee to relocate and accept new
position with employer, barring employee's claim for promissory fraud under
Illinois law; although employee claimed that employer did not fulfill promises
it made, employee admitted **during his** deposition that he did not have any
evidence of fraudulent intent at time promises were made, and failing to live
up to promise was not fraud.

[7] Torts k10(3)
        379k10(3)

Employee's claim against employer's corporate affiliates and affiliates'
officers and employees for tortious interference with employee's prospective
economic advantage was barred, under Illinois law, absent any evidence that
affiliates or affiliates' employees interfered with any of employee's business

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                           Page    4

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830 (N.D.Ill.))**
relationships, or evidence that any alleged actions taken by officers of
affiliates against employee were done solely for officers' own gain, without
regard to corporation.

[8] Federal Civil Procedure k2497.1
          170Ak2497.1

Genuine issues of material fact as to whether or not persons working for both
employer and employer's corporate affiliate made alleged promises to employee,
which employee reasonably relied on in deciding to relocate and accept new
position with employer, precluded summary judgment in employee's claim against
corporate affiliate for promissory estoppel under Illinois law.
                    MEMORANDUM OPINION AND ORDER

 KENNELLY, J.
 *1 Plaintiff Turner Lloyd Croft brought suit against InLight Risk
Management, Inc. ("IRM"), PD Insurance Holdings, Inc. ("PDIH"); Physician
Dynamics Insurance Company ("PDIC"), Development Specialists, Inc. (as assignee
for the benefit of the creditors of Physician Dynamics, Inc. ("PDI")), David
Loucks, Rodman Frates, C.L. Frates & Co. and Jerry Messick for violation of the
Age Discrimination in Employment Act and various state-law claims. The Court
previously dismissed, pursuant to Fed.R.Civ.P. 12(b)(6), Counts 3 (equitable
estoppel) and 5 (intentional infliction of emotional distress) of Croft's
Amended Complaint, and also dismissed Count 6 (tortious interference with
prospective economic advantage) as to defendants Loucks and Messick. Croft
v. InLight Risk Management, Inc., No. 01 C 1766, 2002 WL 226859 (N.D.Ill.
Feb.14, 2002). Development Specialists, Inc. has been dismissed from the case
by stipulation. Defendants Rodman Frates and C.L. Frates have moved for summary
judgment on Count 6, and defendants IRM, PDIC, PDIH, and Loucks have moved for
summary judgment on Counts 1, 2, 4, and 7.
                              Background
 In January 1998, Croft commenced employment as Senior Vice President for Sales
and Marketing of PDIC, an insurance subsidiary of PDI, located in Houston,
Texas. In February 1999, David Loucks, President and CEO of PDI and PDIC,
offered Croft a promotion to Executive Vice President of IRM--an insurance
brokerage company that was going to be created--and Executive Vice President of
PDIC. In these new positions, Croft was to oversee sales and marketing for PDIC
as well as all of IRM's operations. The promotion required Croft to move to
Evanston, Illinois.
 Croft had serious concerns about moving from Houston to Evanston: the cost of
living was higher in Evanston than Houston, and his wife would have to leave
the team of doctors that had been treating her for cancer and abandon her law
practice. Croft contends that in return for taking the promotion and moving to
Evanston, PDIC/PDI (via Loucks) promised him his own office and support staff,
business referrals, increased compensation and benefits, greater
responsibilities, and reimbursement for his moving costs. Additionally, in his
new position, Croft was to report directly to Loucks. Based on these
representations, Croft accepted the promotion, moved to Evanston, and reported
to work on June 7, 1999.
 According to Croft, upon his arrival in Evanston, Loucks, PDI, and PDIC took a
                     Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                             Page    5

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, \*1 (N.D.Ill.))**
series of actions that adversely changed the terms of his promised employment,
including, among other things, hiring Jerry Messick as President and CEO of IRM
and Michael Spaan as Executive Vice President for Sales and Marketing of IRM,
curtailing Croft's responsibilities with the company; ordering Croft to report
to Messick and Spaan rather than to Loucks; failing to provide support staff to
Croft; taking away Croft's office and directing him to work out of his
apartment; ignoring his requests for reimbursement of moving expenses; and
eventually terminating his employment. Croft filed EEOC charges against PDI and
PDIH on June 8, 2000 and October 19, 2000 respectively. He filed this action on
March 13, 2001.

Discussion

**\*2** Summary judgment is proper when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact and that the moving
party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In
determining whether a genuine issue of material fact exists, the Court must
construe all facts and draw all reasonable and justifiable inferences in favor
of the non-moving party, in this case Croft. Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 Count 1: Age Discrimination
 The ADEA prohibits discrimination on the basis of an employee's age. 29
U.S.C. s 623(a)(1). In Count 1, Croft alleges that IRM, PDIC, PDI, and PDIH
took adverse employment actions against him and then terminated him because of
his age, in violation of the ADEA. In support of their summary judgment motion,
defendants first argue that they were not "employers" within the meaning of the
ADEA. The ADEA applies only to "employers," which it defines as entities that
are "engaged in an industry affecting commerce" and who have "twenty or more
employees for each working day in each of twenty or more calendar weeks in the
current or preceding calendar year." 29 U.S.C. s 630(b). The purpose of
exempting smaller employers from the discrimination laws is "not to encourage
or condone discrimination ... [but rather] to spare very small firms from the
potentially crushing expense of mastering the intricacies of the
antidiscrimination laws, establishing procedures to assure compliance, and
defending against suits when efforts at compliance fail." Papa v. Katy
Industries, Inc., 166 F.3d 937, 940 (7th Cir.1999).
 The discrimination of which Croft complains occurred in 1999. Accordingly, to
be liable under the ADEA, Croft's employer must have had at least twenty
workers for each day in each of twenty or more calendar weeks in either 1998 or
1999. Croft does not contend that his employer had the requisite number of
employees in 1998. For 1999, Croft attempts to combine the employees of IRM,
PDIC, PDI, PDIH, and InLight Interactive (which is not a defendant in this
case) under an alter ego theory in order to reach the requisite minimum number
of employees.
 Defendants initially argue that it is improper to combine the employees of
these companies for purposes of reaching the twenty employee threshold because
the companies were separate corporate entities. Though the exemption of a
smaller employer from the discrimination laws may be vitiated by the existence
of an affiliated corporation in limited circumstances, see Papa, 166 F.3d at
940-41, the Court need not decide that issue, as the twenty employee
requirement is not satisfied even after combining all the companies' employees.
Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                              Page    6

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, \*2 (N.D.Ill.))**

   As we must on a motion for summary judgment, the Court views the facts in the
light most favorable to Croft in determining whether he can meet the statutory
requirements. Croft has admitted that neither PDIC nor PDIH had any employees
during 1999. See Plaintiff's Response to Defendants' 56.1(a)(3) Statement of
Material Facts at P 86. He has also admitted that IRM had no employees prior to
September 1, 1999. Id. at P 88. So he must rely on PDI and InLight to
attempt to reach the twenty-employee threshold.

   **\*3** [1] In support of his argument that the threshold is met, Croft
points to two documents. The first, according to Croft, is a "list of those who
had a grant date prior to December, 1999 for warrants of PDI stock." See
Exhibit G to Croft's Affidavit. Croft argues that the "combined number of
employees of PDI, PDIC, IRM, PDIH and InLight Interactive was at least 21"
based upon this list. Plaintiff's 56.1(b)(3) Statement of Additional Facts at P
49. The Court disagrees that this document supports Croft's case. First, Croft
provided little explanation regarding what information the document contains,
and the document itself is barely legible. Second, assuming for purposes of
discussion that the document lists those persons entitled to receive stock in
PDI, that has no bearing on whether those persons were employees of that
company, and an individual is not considered an "employee" of an entity for
purposes of s 630(b) simply because he or she is to receive stock in that
entity. Rather, the standard for existence of an employment relationship is
whether the person appears on the entity's payroll. See Walters v.
Metropolitan Educational **Enterprises, Inc.**, 519 U.S. 202, 206-07, 117 S.Ct.
660, 136 L.Ed.2d 644 (1997). Croft has provided no **evidence** that the
individuals said to be included on the list were on the payroll of any of the
companies in question.

   Croft also relies on a "Private Offering Memorandum" for PDI dated May 28,
1999. See Exhibit H to Croft's Affidavit. In its "Operations and Facilities"
section, the Memorandum states that "[t]he Company [PDI] currently has eight
employees at its headquarters, eight in the [InLight] business unit, [and]
three in the IRM business unit." Id. at p. 13. Defendants contend that this
overstates the actual number of employees of the three entities because some of
the "headquarters" employees were the same persons identified as the business
unit employees. The also point out that even if there were no overlap, the
numbers in the Private Offering Memorandum only add up to nineteen, one short
of the statutory **threshold**. Croft **attempts to overcome** this hurdle by stating
that in May 1999, **PDI had nineteen employees** but "that was before Messick and
Spaan were hired." [FN1] Plaintiff's 56.1(b)(3) Statement of Additional
Facts at P 49.

        FN1. Prior to joining IRM, both Messick and Spaan were employed by
        C .L. Frates. See Plaintiff's Response to Defendants' 56.1(a)(3) Statement
        of Material Facts at P 88.


   [2] Croft's argument suffers from an additional flaw, however. Even if he
can show that at some point, the various defendants had a combined total of
more than twenty employees, this is not enough. Rather, to be considered an
"employer" under the ADEA, the entities--if we were to determine to consider
them collectively--must have had twenty employees for every day of at least
twenty weeks in 1999. Assuming for purposes of discussion that all nineteen
                    Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                          Page    7

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, *3 (N.D.Ill.))**
employees identified in the Private Offering Memorandum remained employed for
the remainder of calendar year 1999, Messick and Spaan would have had to begin
employment with IRM by no later than twenty weeks before the end of the
calendar year, that is, by the week of August 16, 1999. Croft has admitted,
however, that as of August 16, Messick and Spaan were still employees of C.L.
Frates and that prior to September 1, 1999, IRM had no employees whatsoever.
  [FN2] See Plaintiff's Response to Defendants' 56.1(a)(3) Statement of
Material Facts at P 88.

      FN2. Though Messick and Spaan may have held officer/director
      positions with IRM while still employed by C.L. Frates, this alone is not
      enough to confer "employee" status. See, e.g., McGraw v. Warren County
      Oil Company, 707 F.2d 990 (8th Cir.1983) (rejecting notion that directors
      of the corporation were employees); Zimmerman v. North American Signal
      Company, 704 F.2d 347 (7th Cir.1983) (merely serving as director or officer
      not enough to become employee; test is whether a paid employment
      relationship exists), overruled on other grounds, Walters v.
      Metropolitan Educational Enterprises, Inc., 519 U.S. 202, 206-07, 117 S.Ct.
      660, 136 L.Ed.2d 644 (1997).

**\*4** For these reasons, the Court finds Croft has failed to provide evidence
sufficient to establish that the defendants employed at least twenty employees
for at least twenty weeks in 1999, as required before they can qualify as an
"employer" under s 630(b). The Court therefore grants summary judgment in
defendants' favor on Croft's ADEA claim.
  [3] As we have dismissed Croft's only federal claim, the Court must
determine whether to retain jurisdiction over his supplemental state law
claims. "In determining whether to adjudicate such a claim, a federal court
must choose the course that 'best serves the principles of economy,
convenience, fairness and comity which underlie the pendent jurisdiction
doctrine." ' Centres, Inc. v. Town of Brookfield, Wisconsin, 148 F.3d 699,
704 (7th Cir.1998) (citations omitted). The Court concludes that retaining
jurisdiction over Croft's remaining claims would best serve these principles.
The parties have undergone months of discovery to get to this point. They have
extensively briefed the issues in this case both at the motion to dismiss and
summary judgment stages, and via these submissions, the Court has gained a
great deal of familiarity with the facts and legal issues involved in the case.
In addition, Croft's counsel was appointed pursuant to 28 U.S.C. s
1915(e)(1) and the Court's Trial Bar rules, N.D. Ill. LR 83.36, and it is
doubtful that the appointment would carry forward to state court. Accordingly,
though Croft no longer has a federal claim, the Court exercises its discretion
to hear his state claims. See 28 U.S.C. s 1367(c). We therefore turn to
defendants' motions for summary judgment on Croft's remaining claims.
  Count 2: Promissory Estoppel
  Count 2 sets forth a claim of promissory estoppel against Loucks, PDI, and
PDIC. To survive summary judgment on that claim, Croft must provide evidence
from which a reasonable fact finder could determine that defendants made an
unambiguous promise to him, upon which he relied to his detriment, and that his
reliance was expected and foreseeable by the defendants. Quake Construction,
Inc. v. American Airlines, Inc., 141 Ill.2d 281, 310, 152 Ill.Dec. 308, 565

(C) 2004 West Group

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, \*4 (N.D.Ill.))**
N.E.2d 990, 1004 (1990). The Court previously dismissed Croft's promissory
estoppel claim to the extent it sought recovery for untimely termination.
Croft, 2002 WL 226859, at \*3. Accordingly, we address only the promises
Croft contends were made to him regarding the terms and conditions of his
employment.
  Defendants first argue that they are entitled to summary judgment on Croft's
claim because he was not promised anything other than a set salary, title, and
insurance benefits. Croft has, however, offered evidence that he was promised
more than just those items. He testified at his deposition that Loucks also
specifically promised him that he would be responsible for IRM and the
insurance operations of the companies; that he would report directly to Loucks;
that he would be reimbursed for his relocation expenses; that would have his
own office; and that he would be able to hire support staff, including an
assistant with insurance experience and at least one producer to work for him
in Chicago in order to accomplish his duties. Croft Deposition at 160-61.
  \*5 [4] The defendants next argue that Croft received everything that he
was promised--albeit not for as long as he had hoped. Croft admits in his
deposition that he began to draw the promised $150,000 salary in April and that
he continued to be paid that salary until the time of his termination in
December, 1999. Croft Deposition at 69. The record is not so clear, however,
with respect to the other promises made to Croft. For example, though Croft
admits that he was given the title of Executive Vice President, see Croft Dep.
at 163, he also provides evidence that the position was gutted of all the
responsibilities that should have accompanied it. Specifically, Croft testified
that upon his arrival in Evanston, he was informed that Jerry Messick would be
the president of IRM, that he would have to report to Messick (rather than
David Loucks), and that Messick would essentially be "doing the role that
[Croft] thought [he] was going to be doing in Evanston." Croft Deposition at
57. Additionally, at or near the same time, Croft was informed that Michael
Spaan had been hired, that Croft would be responsible only for the Chicago
office, and that he would have to report to Spaan as well. Id. Rather than
being in charge of IRM and directing PDIC's insurance operations, Croft instead
was relegated to selling insurance. Croft provides other evidence that the
defendants never made good on their promises; for example, Croft was never
given a "producer" to assist in generating sales and never was reimbursed for
his relocation expenses. In short, Croft has provided evidence sufficient to
survive summary judgment on his claim that defendants promised him certain
benefits that they never delivered. [FN3]

        FN3. Defendants argue, citing Ecton v. Van Houten North America,
      Inc., No. 94 C 6825, 1996 WL 296587 (N.D.Ill.1996), that Croft, as an at-
      will employee, had no continuing interest in certain terms or conditions of
      employment. Rather, his employment was cancelable at will and its terms
      were changeable at will. However, Croft's claim in Count 2 is not that he
      was damaged by defendants' failure to continue his employment on the terms
      promised, but rather that he was damaged by giving up all that he had in
      Houston in reliance on defendants' promises.

  Defendants also dispute that Croft relied on their promises when he decided to
move to Evanston. They argue that Croft accepted the position in February

(C) 2004 West Group

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, \*5 (N.D.Ill.))**
1999--three months before his move--and that the promises Croft now contends
were broken were made after that time. Thus, defendants argue, Croft could not
have relied upon those promises when he made the decision to move. The record,
however, contains evidence that though Croft tentatively agreed to accept the
position in February 1999, he continued to discuss the details of the position
and whether he should ultimately take it up until the time of his move. See,
e.g., Croft Deposition at 49, 160, 193-95. This is evidence from which a jury
reasonably could infer that Croft ultimately decided to move to Evanston based
on the totality of the conditions for his new employment.
  The Court also rejects defendants' final contention that Croft was not damaged
by the changes in the terms and conditions of his employment because his only
"damage" stemmed from his termination. To the contrary, Croft's claimed damages
stem from what he says he gave up based on the promises of the defendants--a
good job and his personal situation in Houston.
  [5] For these reasons, the Court denies PDI and PDIC's motion for summary
judgment on Croft's promissory estoppel claim. However, we grant summary
judgment in favor of defendant Loucks; there is no basis for holding him
personally liable under a promissory estoppel theory, as he was acting as the
agent of the corporations. The evidence indicates that Croft was dealing with
PDI/PDIC with respect to his employment--not with Loucks personally. Croft
provides no basis for holding Loucks personally liable on a quasi-contract
theory. See, e.g., Gateway Erectors Division of Imoco-Gateway Corp. v.
Lutheran General Hospital, 102 Ill.App.3d 300, 58 Ill.Dec. 78, 430 N.E.2d 20
(1981) (an agent of a disclosed principal is not liable for non-performance
under a contract theory).
  Count 4: Promissory Fraud
  **\*6** [6] To succeed on his claim of promissory fraud, Croft must provide
evidence from which a jury reasonably could infer that the defendants made a
false promise, not intending to keep it, as part of a scheme to defraud
intended to induce him to act for their benefit. See Bower v. Jones, 978
F.2d 1004, 1011-12 (7th Cir.1992). As discussed above, Croft provides evidence
showing that there are genuine issues of fact regarding defendants' making of
various promises to induce him to move to Evanston. However, Croft has failed
to adduce any evidence that the promisor, David Loucks, never intended to keep
his word. At his deposition, when asked whether he had any such evidence, Croft
answered "[n]o, I don't." Croft Deposition at 157. In response to the motion
for summary judgment, Croft **argues that Loucks made** the decision to hire
Messick before Croft moved to **Chicago. [FN4] Plaintiff's** Memorandum in
Opposition to Summary Judgment at 10. But this indicates, at most, only that
defendants may have intended eventually to replace Croft with Messick, not that
Loucks' promises about Croft's employment were false when made. Indeed, Croft
asserts in his brief that sometime before he moved to Evanston, defendants
"decided to renege on the promises made to Croft." Plaintiff's Opposition to
Summary Judgment at 3. Failing to live up to a promise does not constitute
fraud. See Bower, 978 F.2d at 1012 ("A change of mind can be a breach of
contract ... but it is not fraud") (quoting Price v. Highland Community
Bank, 722 F.Supp. 454, 459-60 (N.D.Ill.1989)).

      FN4. However, Croft testified in his deposition that he had "no idea"
   when the decision was made to bring Messick on board. Croft Deposition at
                     Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                         Page    10

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, \*6 (N.D.Ill.))**
        61.

   Based on the evidence provided, no reasonable fact finder could infer
fraudulent intent on the part of the defendants, as opposed to a change of
heart. The burden on a plaintiff claiming promissory fraud is "deliberately
high," and "[w]ithout 'specific objective manifestations of fraudulent intent'
there can be no promissory fraud." Bower, 978 F.2d at 1012 (quoting
Hollymatic Corporation v. Holly Systems, Inc., 620 F.Supp. 1366, 1369
(N.D.Ill.1985)). For these reasons, the Court grants defendants' motion for
summary judgment on Count 4.
   Count 6: Tortious Interference With Prospective Economic Advantage
   Croft's only remaining claim for tortious interference with prospective
advantage is against defendants Rodman Frates and C.L. Frates & Co; the Court
previously dismissed this claim as to defendants Loucks and Messick. To avoid
summary judgment on his tortious interference claim, Croft must provide
evidence from which a jury reasonably could find that he had a reasonable
expectation of entering into or continuing a valid business relationship, that
defendants knew of his expectation, that they intentionally interfered with his
expectation, and that he was damaged as a result of the interference.
Schuler v. Abbott Laboratories, 265 Ill.App.3d 991, 994, 203 Ill.Dec. 105,
639 N.E.2d 144, 147 (1993).
   [7] C.L. Frates argues that summary judgment in its favor is appropriate
because Croft has no evidence that it did anything to interfere with Croft's
business relationships. The Court agrees. When asked in his deposition how C.L.
Frates interfered with his business relationships, Croft testified "I don't
know what [C.L. Frates'] role was." Croft Deposition at 180. Croft attempts to
implicate C.L. Frates by arguing that Jerry Messick was "involved in Croft's
promotion," and that during the time Croft was making the transition to
Evanston, Messick was still an employee of C.L. Frates. Plaintiff's Opposition
to Defendants' Motion for Summary Judgment at 4. To hold C.L. Frates liable for
the intentional torts of its employee, Croft must show that Messick was acting
within the scope of his employment with respect to the transaction at issue and
was at that time furthering the interests of his employer. See, e.g., Gregor
v. Kleiser, 111 Ill.App.3d 333, 337-38, 67 Ill.Dec. 38, 443 N.E.2d 1162, 1166
(1983). In support of his claim, Croft offers only the bald assertion that
"C.L. Frates is responsible for Messick's conduct." Plaintiff's Opposition at
4. However, Croft has provided no evidence that any alleged actions taken by
Messick were to further the interests of C.L. Frates or were done within the
scope of his employment for that company. Accordingly, the Court grants C.L.
Frates' motion for summary judgment on Count 6.
   \*7 Croft's claim against Rodman Frates fares no better. Croft alleges that
Frates is liable for tortious interference because he participated in the
decision to replace Loucks with Messick. Even assuming that Frates did
participate in that decision (which is disputed), summary judgment is
appropriate. Croft admitted in his deposition that whatever actions Frates took
were done solely in his role as a PDI board member. Croft Deposition at 179-84.
Illinois law has "recognized a privilege for corporate officers and directors
to use their business judgment and discretion on behalf of their corporations.
This qualified privilege applies to situations involving a corporate
officer's ... 'interference' with the corporation's contractual relationship
                    Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                                      Page    11

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, \*7 (N.D.Ill.))**
between the corporation and an employee." Chapman v. Crown Glass
Corporation, 197 Ill.App.3d 995, 1005, 145 Ill.Dec. 486, 557 N.E.2d 256, 263
(1990) (citations omitted). This privilege is destroyed only if the alleged
interference by the corporate officer or director is done "solely for the
person's own gain or is solely for the purpose of harming the plaintiff."
Id. at 1006, 145 Ill.Dec. 486, 557 N.E.2d at 263; see also Schuler, 265
Ill.App.3d at 995, 203 Ill.Dec. 105, 639 N.E.2d at 148 (plaintiff must show
malice or lack of justification to sustain claim against corporate officer or
director). Croft has provided no evidence that Frates acted--if at all--solely
for his own gain or that he had a personal vendetta against Croft. Accordingly,
the Court grants Rodman Frates' motion for summary judgment on Count 6.
  Count 7: Alter Ego Liability
  [8] In Count 7, Croft asserts that PDI, IRM, PDIC, and PDIH "shared
management, operational support, personnel operations, strategic planning and
significant common ownership ... [and] they should each be considered the alter
ego of the others." Amended Complaint PP 69, 70. As an initial matter, though
Croft asserts alter ego liability as a separate claim, it is not an independent
cause of action; rather, it is a means for a plaintiff to hold one party liable
for the actions of others. See In re Rehabilitation of Centaur Insurance
Company, 238 Ill.App.3d 292, 300, 179 Ill.Dec. 459, 606 N.E.2d 291, 296 (1992).
Croft's only remaining claim at this point is his promissory estoppel claim
against PDI and PDIC. The Court concludes that he has provided sufficient
evidence to avoid summary judgment on the issue of affiliate liability.
  In Papa v. Katy Industries, Inc., supra, the Seventh Circuit recognized
various means of establishing affiliate liability, including showing that the
traditional conditions for piercing the corporate veil are present or when one
corporation may have directed the alleged wrongful act of the other. Papa,
166 F.3d at 940-41. Croft argues that he has provided sufficient evidence on
both points. In their motion, defendants emphasize that once the companies
completed a "reverse spin-off transaction," **there ceased** to be any relationship
between PDIC, PDIH, and IRM on the one hand and PDI on the other. "Accordingly,
defendants PDIH, PDIC and IRM cannot be liable for any obligation of PDI."
Defendants' Memorandum in Support of Summary Judgment at 20. The Court
disagrees. As defendants recognize, this "reverse spin-off transaction" did not
occur until September 30, 1999--well after the alleged promises to Croft were
broken. Further, Loucks--the alleged promisor--served both as the President and
CEO of PDI and the President and CEO of PDIC around the time of Croft's move.
Before accepting the new position, Croft was employed by PDI, and the new
position was to encompass duties for PDIC and IRM. Thus one reasonably could
conclude that the alleged promises were made and broken by persons acting on
behalf of each of these entities, a proper basis for alter ego liability under
Papa. Croft has provided no basis, however, to impose alter ego liability on
PDIH. For these reasons, the Court grants summary judgment in favor of PDIH on
Count 7 but denies summary judgment with respect to PDIC and IRM.
                                Conclusion
  **\*8** For the foregoing reasons, the Court grants defendants C.L. Frates' and
Rodman Frates' motion for summary judgment [docket item # 48-1]. The Court
grants in part the motion for summary judgment of defendants IRM, PDIH, PDIC,
and Loucks [item # 52-1]; the motion is denied as to the promissory estoppel
claim against defendants PDI (Development Specialties, Inc.) and PDIC, as well
                   Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

(C) 2004 West Group                                          Page    12

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31010830, *8 (N.D.Ill.))**
  as the claim of alter ego liability against defendants PDIC and IRM, and is
  otherwise granted. The date for filing the final pretrial order is extended to
  October 31, 2002. The case remains set for trial on January 6, 2003 and is
  hereby set for a status hearing on September 17, 2002 at 9:30 a.m. for the
  purpose of discussing **the possibility** of settlement.
  2002 WL 31010830 (N.D.Ill.)
END OF DOCUMENT
                        Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works